J-S63044-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.C.W., JR., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C.W., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 868 WDA 2018 |

Appeal from the Order Dated May 14, 2018
in the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  CP-05-DP-0000022-2016

| | | |
|---|---|---|
| IN RE: J.C.W., JR., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C.W., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 869 WDA 2018 |

Appeal from the Order Dated May 14, 2018
in the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  CP-05-DP-0000022-2016,
No. 10 Adoption 2017

J-S63044-18

| IN RE: S.J.W., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C.W., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 870 WDA 2018 |

Appeal from the Order Dated May 14, 2018
In the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  9 Adoption 2017

| IN RE: S.J.W., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C.W., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 871 WDA 2018 |

Appeal from the Order Dated May 14, 2018
in the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  DP-23 for the year 2016

| IN RE: C.J.W., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C.W., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 872 WDA 2018 |

Appeal from the Order Dated May 14, 2018
in the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  No. DP-24 for the year 2016

- 2 -

J-S63044-18

| IN RE: C.J.W., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C.W., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 873 WDA 2018 |

Appeal from the Order Dated May 14, 2018
in the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  12 Adoption 2017

| IN RE: D.E.W., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C.W., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 874 WDA 2018 |

Appeal from the Order Dated May 14, 2018
in the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  DP- 25 - 2016

| IN RE: D.E.W., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C.W., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 875 WDA 2018 |

Appeal from the Order Dated May 14, 2018
in the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  11 Adoption 2017

- 3 -

J-S63044-18

BEFORE:  OTT, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED DECEMBER 12, 2018**

Appellant, J.C.W. ("Father"), files these consolidated appeals from the orders dated May 14, 2018,[1] in the Bedford County Court of Common Pleas, granting the petitions of Bedford County Children and Youth Services ("BCCYS") and involuntarily terminating his parental rights to his dependent children, sons, J.C.W., Jr., born in October 2013, S.J.W., born in August 2012, and C.J.W., born in September 2011, and daughter, D.E.W.,[2] born in November 2006 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[3]  Father further appeals from

---

[*] Former Justice specially assigned to the Superior Court.

[1] The subject orders were dated May 14, 2018.  While the docket reflects a filed date of May 24, 2018, there is no notation on the docket that notice was given and that the orders were entered for purposes of Pa.R.C.P. 236(b).  ***See Frazier v. City of Philadelphia***, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given"); ***see also*** Pa.R.A.P. 108(a) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)".).  Thus, the orders were not entered and the appeal period not triggered.  Although we consider the matter on the merits, we caution the Clerk of the Court of Common Pleas of Bedford County as to compliance with the rules with regard to the entry of orders.

[2] Father is the adoptive father of D.E.W.  ***See*** Exhibit 1, 1/2/18, at 2; ***see also*** N.T., 1/2/18, at 46.

[3] By the same orders, the trial court involuntarily terminated the parental rights of the Children's mother, L.C., ("Mother").  Mother has not filed an appeal of these orders.

- 4 -

J-S63044-18

the orders dated May 14, 2018[4] changing the Children's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[5]  After review, we affirm as to C.J.W. and D.E.W., vacate as to J.C.W., Jr., and S.J.W., and remand for further proceedings consistent with this memorandum.

The family became known to BCCYS in March 2015 due to issues of substance abuse, and remained active with BCCYS throughout 2015 and into 2016 due to continued issues of substance abuse, unstable housing, domestic violence, and parenting skills.  Order of Adjudication and Disposition – Child Dependent, 3/24/16,[6] Findings of Fact.  The Children were removed from

_____

[4] Again, there is no notation on the docket that notice was given and that the orders were entered for purposes of Pa.R.C.P. 236(b).  **See Frazier**, 557 Pa. at 621, 735 A.2d at 115; **see also** Pa.R.A.P. 108(a).  Thus, the orders were not entered and the appeal period not triggered.

[5] We note that Father does not reference the goal change in the statement on his notices of appeal.  Rather, Father indicates the termination of his parental rights only.  However, Father attaches the docket entries for the permanency review orders in which the goal was changed to adoption.

  Further, as the trial court entered separate orders changing the Children's goal to adoption, Father improperly filed only one notice of appeal and one concise statement of errors complained of on appeal from the orders as to each child.  **See** Pa.R.A.P. 341, Note ("Where, however, one or more orders resolves [sic] issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed.").  Because we discern no prejudice arising from this procedural misstep, we decline to quash or dismiss Father's appeal.  We, however, recognize our Supreme Court's recent decision in **Commonwealth v. Walker**, ___ Pa. ___, 185 A.3d 969, 977 (2018) (holding, "**[P]rospectively**, where a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each case.") (Emphasis added).

[6] Given the issue as to entry of orders on the docket, we reference all orders by order date.

- 5 -

parental care by emergency order dated and entered March 17, 2016. Order for Emergency Protective Custody, 3/17/16. Subsequent to shelter care orders dated March 18, 2016, and filed March 22, 2016, maintaining their commitment, the Children were adjudicated dependent by order dated March 24, 2016, and filed March 29, 2016. Shelter Care Order, 3/22/16; Order of Adjudication and Disposition – Child Dependent, 3/24/16. Specifically, in adjudicating the Children dependent, the court noted as follows in its Findings of Fact:

> On March 17, 2015, BCCYS received a report regarding drug use/abuse by the [Children's] parents [] and other household members [].
>
> [BCCYS] began an intake assessment of the family and since March, 2015, the children moved from place to place staying with various family members and one parent or the other as the parents split up and got back together.
>
> On November 18, 2015, [BCCYS] made a referral for Family Guidance through Independent Family Services. The family has not been actively participating in the services.
>
> The children have not had a stable home environment and several of the caregivers that the parents have left the children with are known drug users and/or individuals who have lost custody of their own children due to various reasons known to the agency.
>
> The mother has entered drug treatment on multiple occasions, but has not completed any program successfully.
>
> Law enforcement has been called to the residence several times for various issues and multiple reports from multiple sources have reported drug and alcohol concerns, domestic violence concerns, and lack of parenting skills of the parents.
>
> In September 2015, assault charges were filed on the father for an incident involving the mother.

On January 8, 2016, [BCCYS] received a report that one of the minor children witnessed the mother giving herself a shot in the foot and elbow.

On February 24, 2016, the mother [] admitted to caseworker, Joy Bowser[,] that she had been snorting heroin. [BCCYS] requested that the mother enter a treatment program. Then, on February 26, 2016, the mother reported that she was attempting to set up an appointment with Twin Lakes.

On March 3, 2016, [BCCYS] made a home visit and spoke with the father []who reported that he was going to pick up the mother on March 4, 2016 from Pyramid in Altoona as she had entered treatment there approximately one week prior. Within a week of the mother[] returning from treatment, law enforcement was at the residence again as a result of an altercation between the parents. No charges were filed against either parent, but the father left the residence and went to State College with two (2) of the children.

On March 15, 2016, the caseworker attempted a home visit and there was no answer. The mother texted the caseworker stating that she had an appointment set up with Twin Lakes.

On March 16, 2016, it was reported that the mother was using heroin on March 15, 2016 and was vomiting when the CYS worker visited and no one answered the door. The mother dropped the children off with known drug users and went to the hospital for treatment for being sick the night before.

Order of Adjudication and Disposition – Child Dependent, 3/24/16, Findings of Fact.

Permanency review hearings were held on August 23, 2016, February 7, 2017, and July 20, 2017. Throughout these reviews, the trial court maintained the Children's commitment, and permanency goal. Father's progress toward remedying the circumstances causing the children to be placed was consistently noted as minimal. **See** Permanency Review Orders, 8/23/16; Permanency Review Orders, 2/7/17; Permanency Review Orders,

7/20/17. Notably, Father's visitation remained supervised and then was suspended due to continued substance abuse issues and domestic violence.[7] Notes of Testimony ("N.T."), 11/15/17, at 6-8, 13-17, 33-35, 53, 57; **see also** Exhibit 12, 5/14/18.

BCCYS filed petitions for goal change and to terminate Mother's and Father's parental rights on July 11, 2017. The court held combined termination/goal change hearings on January 2, 2018 and May 14, 2018. In support of its petitions, BCCYS presented the testimony of: Terry O'Hara, Ph.D., licensed psychologist, who conducted individual evaluations with regard to Mother and Father and interactional evaluations of the children with Mother and Father and with their respective resource parents;[8] Dennis Williamson, Family Counseling and Training Associates, who conducted anger management sessions with Father; Cheryl Ward, licensed professional counselor, Cornerstone Community Services, who provided individual and group counseling services to Father through Bedford County Mental

---

[7] Testimony was presented of a physical altercation occurring between Mother and Father on September 1, 2017 and an unsuccessful attempt to get Father to take a drug test on November 7, 2017. N.T., 5/14/17, at 69-70; N.T., 11/15/17, at 6-8, 13-17.

[8] All four children were placed with paternal relatives. At the time of the hearing, J.C.W., Jr. and S.J.W. were placed together, and C.J.W. and D.E.W. were each placed separately. N.T., 1/2/18, at 7-8.

Health/Mental Retardation Agency[9]; Deborah Kissel, program director and master's level clinician, Independent Family Services ("IFS"); Jessica Thomas, drug and alcohol counselor, Twin Lakes;[10] and Natasha Crissey, caseworker, BCCYS. BCCYS additionally presented Exhibits 1 and 2 on January 2, 2018, and Exhibits 1 through 12 on May 14, 2018, which were admitted without objection. N.T., 5/14/18, at 78-81. Mother and Father were present and represented by counsel. Father testified on his own behalf. The Children were represented by a guardian *ad litem*, Carol Ann Rose, Esquire, who had been involved throughout the dependency proceedings. Further, pursuant to order dated October 10, 2017, the two older children, C.J.W. and D.E.W., were also appointed separate legal counsel, Gerald M. Nelson, Esquire, to represent their legal interests.[11] Both Attorney Rose and Attorney Nelson participated in the relevant hearings with regard to termination and goal change.

By orders dated May 14, 2018, the trial court involuntarily terminated the parental rights of Father to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and changed the permanency goal to adoption. On June 5, 2018, Father, through appointed counsel, filed timely

---

[9] Bedford-Somerset Mental Health/Mental Retardation Agency is now known as Bedford-Somerset Developmental & Behavioral Health Services.

[10] Ms. Thomas testified as to counseling services provided to Mother.

[11] Attorney Rose requested the court appoint separate legal counsel for the two older children, suggesting a conflict between their best interests and legal interests, but expressed no conflict as to the younger two children. N.T., 5/14/18, at 120; N.T., 10/10/17, at 5-6.

notices of appeal, as well as concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated on June 26, 2018. Thereafter, by order dated July 2, 2018, and entered July 3, 2018, the trial court directed this Court to the transcript containing its findings and conclusions for purposes of Pennsylvania Rule of Appellate Procedure 1925(a).

On appeal, Father raises the following issues for our review:

A. Whether the trial court erred/abused its discretion in determining Petitioner had shown clear and convincing evidence for changing the goal to adoption, as such a finding was not in the children's best interest, and not supported by the record?

B. Whether the trial court erred/abused its discretion by determining there was clear and convincing evidence pursuant to 23 Pa C.S.A. §2511(a)(1) as the evidence did not show the Father relinquished parental claim or refused to perform parental duties?

C. Whether the trial court erred/abused its discretion by determining the requirements of §2511 (a)(2), (a)(5) and (a)(8) were met by clear and convincing evidence, as the evidence was insufficient to show that the conditions and the causes of the incapacity to parent were continuing or not likely to be remedied?

Father's Brief at 5.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of

- 10 -

manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

- 11 -

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

However, prior to addressing the merits of Father's appeal, we must first address the Children's statutory right to counsel. This Court has held that we will address *sua sponte* the failure of an orphans' court to appoint counsel pursuant to 23 Pa.C.S.A. § 2313(a).[12] *See In re K.J.H.*, 180 A.3d 411, 413 (Pa.Super. 2018). Our Supreme Court, in *In re Adoption of L.B.M.*, 639 Pa. 428, 441-42, 161 A.3d 172, 180 (2017) (plurality), held that Section 2313(a) requires that counsel be appointed to represent the legal interests of any child

_____

[12] Section 2313 provides, in relevant part:

§ 2313. Representation.

**(a)** **Child.--**The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

. . .

involved in a contested involuntary termination proceeding. The Court defined a child's legal interests as synonymous with his or her preferred outcome and distinct from a child's best interests, which must be determined by a court. *Id.* at 432, 174-75.[13] Since **L.B.M.**, this Court has clarified the requirements counsel must meet in order to provide adequate representation in termination matters. **See In re Adoption of T.M.L.M.**, 184 A.3d 585, 587-91 (Pa.Super. 2018). Further, in finding that the trial court did not err in allowing the children's guardian *ad litem* to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome of the termination proceeding, our Supreme Court set forth that a conflict did not exist if the child in question is too young or non-communicative such that their preference is not discernable. **In re T.S.**, ___ Pa. ___, 192 A.3d 1080, 1089-1090 (2018). The Court reasoned, "As a matter of sound logic, there can be no conflict between an attorney's duty to advance a subjective preference on the child's part which is incapable of ascertainment, and an attorney's concurrent obligation to advocate for the child's best interests as she understands them to be." *Id.* at 1090. As such, the Court held, ". . .[I]f the preferred outcome of the child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his

---

[13] This requirement was additionally extended to dependency matters. **See In re J'K.M.**, 191 A.3d 907 (Pa.Super. 2018) (reversing order denying appointment of a separate counsel for dependency proceedings where there was a conflict between the child's best interests and legal interests).

or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed 'to represent the child,' 23 Pa.C.S.[A.] § 2313(a), is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings." **Id.** at 1092-93.

Here, Attorney Rose indicated that she spoke with C.J.W. and D.E.W. and, as they desired to maintain contact with Mother and Father, she requested the appointment of separate legal counsel on their behalf. N.T., 10/10/17, at 5-6. Attorney Nelson was thereafter appointed to represent the legal interests of C.J.W. and D.E.W. However, Attorney Rose stated that she did not speak with J.C.W., Jr. and S.J.W. **Id.** J.C.W., Jr. and S.J.W. were four and five years old, respectively, at the time, approximately three months prior to the first termination/goal change hearing. There is no indication that their preferred outcome was not able to be ascertained. There is no indication that they were not communicative and unable to provide at least some input as to their preferred outcome. **In re T.S.**, ___ Pa. ___, 192 A.3d at 1092-93. Further, the record contains no clear indication of J.C.W., Jr.'s and S.J.W.'s preferences. While Dr. O'Hara indicated a positive relationship and affection between Father and the Children, the interactional evaluation conducted by Dr. O'Hara suggested a positive relationship between J.C.W., Jr., and S.J.W.

and their foster mother.[14]  ***See*** Exhibit 1, 1/2/18, at 38-39; ***see also*** N.T., 1/2/18, at 23.

Accordingly, we are constrained to vacate the orders as to J.C.W., Jr., and S.J.W. in this matter, and remand for further proceedings.  ***See T.M.L.M.***, 184 A.3d at 587-91 (vacating and remanding for further proceedings where the attorney admitted she did not interview the six-year-old child to ascertain the child's preferences); ***see also In re Adoption of M.D.Q.***, 192 A.3d 1201 (Pa.Super. 2018) (vacating and remanding where the record does not indicate that counsel attempted to ascertain the children's preferences and the record does not reflect the children's legal interests); ***see also In re Adoption of D.M.C.***, 192 A.3d 1207 (Pa.Super. 2018) (vacating and remanding where the record was unclear in what capacity attorney had been appointed to represent children and whether attorney had ascertained children's legal interests prior to hearing); ***see also L.B.M.***, 161 A.3d at 183 (majority of court holding deprivation of child's right of counsel is structural error not subject to harmless error analysis).

_____

[14] Dr. O'Hara noted as follows:

> The boys exhibited several components of security in their relationship with [their foster mother].  They were well-behaved throughout the evaluation, happily entered  into the evaluation room with [their foster mother], referred to her as "Mom," excitedly interacted with her, smiled, showed curiosity, were verbal and vocal, and frequently directed themselves to their great-paternal aunt. . . .

Exhibit 1, 1/2/18, at 39.

On remand, the orphans' court shall appoint separate legal-interests counsel for J.C.W., Jr., and S.J.W. Such counsel must attempt to ascertain J.C.W., Jr., and S.J.W.'s preferred outcomes as to Father by directly interviewing them, following their direction to the extent possible, and advocating in a manner that comports with their legal interests. Counsel should discern from J.C.W., Jr., and S.J.W. whether they prefer adoption by their foster parent if the adoptive family does not support continued contact with Father. If J.C.W., Jr., and S.J.W. are unable to express clearly their position as to Father or direct counsel's representation to any extent, counsel shall notify the court. We observe that J.C.W., Jr., and S.J.W. may have differing preferred outcomes as to Father, in which case counsel shall inform the court, and the court shall appoint additional legal-interests counsel, so that each child is represented separately, and conduct further proceedings consistent with this memorandum.

Once a preferred outcome is identified, counsel shall notify the orphans' court whether termination of Father's parental rights is consistent with J.C.W., Jr., and S.J.W.'s legal interests. If J.C.W., Jr., and S.J.W.'s preferred outcome is consistent with the result of the prior termination/goal change proceedings, the court shall re-enter its May 14, 2018 orders as to Father. If the preferred outcome is in conflict with the prior proceedings, the court shall conduct a new termination/goal change hearing as to Father only to provide J.C.W., Jr., and S.J.W.'s legal counsel an opportunity to advocate on behalf of their legal interests. *See T.M.L.M.*, 184 A.3d at 591 (ordering that trial court shall

- 16 -

conduct a new hearing only if it serves the "substantive purpose" of providing the child with the opportunity to advance his legal interests through new counsel).

We therefore proceed to the merits of the termination and goal change orders as to C.J.W. and D.E.W. In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination orders pursuant to subsections 2511(a)(8) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as

> inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), and (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(8).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003).

Once the twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the agency supplied over a realistic period. *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009). "Notably, termination under Section 2511(a)(8)[] does *not* require an evaluation of [a parent's] willingness or ability to remedy the conditions that

led to placement of her children." **In re Adoption of R.J.S.**, 901 A.2d 502, 511 (Pa.Super. 2006) (citations omitted) (emphasis in original).[15]

In the case at bar, Father's challenge to Section (a)(8), as well as Sections (a)(2) and (a)(5), relates to the conditions which led to the removal or placement of the Children. Father asserts that the circumstances which led to the placement of the Children, which included unstable housing, domestic violence, mental health/anger management concerns, and a lack of parenting skills, were remedied or were in the process of being remedied. Father's Brief at 15-19. Father argues,

> [Father] submits the conditions that [led] to the placement of his children, unstable housing, domestic violence between the parents, anger/mental health issues, and lack of parenting skills, had been remedied, or were in the process of being remedied.
>
> At the time of the second hearing regarding the Petitions, [Father] had maintained a 2 bedroom residence for nearly a year. He has maintained the rental and kept the utilities current out of his own pocket. Service providers agreed it was [] stable and appropriate.
>
> As to [Father]'s mental health and anger management issues, the majority of the testimony showed he no longer had the need for treatment. Dr. Terry O'Hara, who performed evaluations of the parents and children, noted there were diagnoses of major depressive disorder, explosive disorder, and cyclical mood

---

[15] We observe that Sections 2511(a)(8) and (b) both require a court considering a termination petition to assess the needs and welfare of the relevant child or children. However, the needs and welfare analysis required by Section 2511(a)(8) is distinct from the needs and welfare analysis required by Section 2511(b), and must be addressed separately. **See In re C.L.G**., 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*) ("[W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' . . . they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).")

disorder from collateral source information he received. However, he agreed there were limitations to his opinions because he was unable to contact the collateral sources directly. Furthermore, while he did make a diagnosis of alcohol use disorder, he could only state there was some evidence of the other mental health conditions, but not enough for a diagnosis.

As for anger management, [Father] completed the introductory phase of the course conducted by Dennis Williamson, and attended three additional sessions after that. He recognized what he needed work on. He was able to learn techniques at controlling anger, and seemed to exhibit understanding. [Father] testified that he practiced making good choices, and keeping himself occupied. However, his employment made it difficult to continue with the counseling, when he was working 6-7 days a week. He also noted difficulties in paying for the course, as he had paid $500 for the sessions he did attend, which was not the whole course.

Moreover, there was no indication [Father] had a continued need for mental health counseling. It appears the main source of his frustrations, [sic] was the acrimony in his relationship with the children's mother, L.C., as it was noted by several service providers. However, the evidence presented at the hearing was that the parents had ended their relationship months ago, and no longer had any contact. [Father] testified he does not speak to the mother. The CYS caseworker testified the children were never injured in the care of their parents. Cheryl Ward, who provided individual counseling to [Father] agreed that he was not a danger to himself or others. Thus, the contention that [Father]'s mental health was a continued barrier to the return of his children is baseless.

[Father] had also made progress in developing parenting skills. [Deborah] Kissel, from Independent Family Services, testified that the parents' participation in services was cyclical. However, she also noted that [Father] demonstrated understanding of "relevant parenting points[,"] but not the hands on application of the skills. [Father] submits the evidence shows he did apply the parenting skills learned in the program, when he was able to. Unfortunately, his contact with his children was limited to phone calls by court order, which was prompted by past domestic violence between the parents, and drug use on the part of the mother. Had [Father] been able to continue to visit with his children, he could have successfully demonstrated his

parenting skills. In the limited contact he did have after October 10, 2017, during the evaluation with Dr. O'Hara, there were some difficulties noted, but also "positive parenting skills." Dr. O'Hara observed that [Father] encouraged sharing between the children, exhibited affection, and praised the children.

Therefore, based on the foregoing, [Father] requests that this Honorable Court find he had remedied or made progress in alleviating the conditions leading to placement, and any evidence to the contrary was insufficient to grant the termination petitions.

*Id.* at 15-19 (citations to record omitted). We disagree.

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(8). The record substantiates that the C.J.W. and D.E.W. have been removed from parental care for a period exceeding twelve months and that the reasons for removal persisted. C.J.W. and D.E.W. had been in care for over twelve months, having been removed from parental care on March 17, 2016. N.T., 5/14/18, at 61, 68, 73.

Further, the evidence reveals that the conditions which led to the C.J.W. and D.E.W.'s placement had not been remedied. Directly to this point, Natasha Crissey, BCCYS caseworker, testified that the circumstances that resulted in the removal of the children continued to exist. *Id.* at 68. Specifically, the record reveals that Father failed to complete anger management counseling. As testified by Dennis Williamson, who provided anger management sessions to Father, Father "dropped out" of his continued therapy that was scheduled to occur every two weeks after only three sessions. N.T., 1/2/18, at 57-58; *see also* Exhibit 2, 1/2/18. Additionally, Father was inconsistent in his attendance of individual mental health counseling, resulting in closure of his case. N.T., 5/14/18, at 10. Moreover,

- 21 -

as indicated by Deborah Kissel, program director of IFS, Father's participation with the program was not consistent, but was "cyclical."[16] *Id.* at 19-20. Thus, Ms. Kissel concluded that Father "failed to alleviate or address the concerns that initiated the services." *Id.* at 20. While recognizing some progress as to housing, she expressed issues as to parenting as observed in supervised visitation, anger management, and mental health treatment. *Id.* at 24-26.

Likewise, the record supports the trial court's finding that terminating Father's parental rights would best serve the needs and welfare of the children. At the time of the conclusion of the relevant hearings, C.J.W. and D.E.W. had been in care for over two years. *Id.* at 62. During this time, Father's visitation remained supervised until suspended in October 2017 and has remained suspended.[17, 18] *Id.* at 61, 73-74; *see also* Exhibit 12, 5/14/18; *see also* Order, 10/10/17. Further, and significantly, Dr. Terry O'Hara opined that Father was not in a position to adequately provide for the children's needs and welfare. Dr. O'Hara stated:

> Q. And then, Doctor, with regard to [Father], do you believe that based on your evaluations and information that was provided

---

[16] IFS provided family guidance services "focused on parenting, home management, drug and alcohol treatment, domestic violence, as well as mentoring services for [D.E.W.]" N.T., 5/14/18, at 16-17.

[17] As recounted by Ms. Crissey, visitation remained supervised at the request of the service provider due to lack of "significant progress to warrant unsupervised." N.T., 5/14/18, at 61-62.

[18] Father testified as to one unsupervised visit with the children. *Id.* at 101-02.

to you that [Father] is in a position at the present time to adequately care for the children's needs and welfare?

A.  No, I do not have sufficient evidence of that.

Q.  And can you summarize for the [c]ourt the reasons for that particular opinion?

A.  Yes.  And I should say that this applies to [Mother], as well.  I think [Mother] and [Father] both very much care for the children and care deeply about the children as well.  I think that's true for both of them.

But with regard to [Father], he takes no responsibility for his circumstances and that's problematic as given his concerns which I'll outline.  I don't have evidence that he's willing to make substantive changes and really address a lot of the long[-]standing concerns which include mental health issues, substance abuse, significant alcohol abuse, and there are also anger management issues.  So, there's evidence from the collateral source, which I referenced earlier, Bedford Somerset Developmental and Behavioral Health Services[,] that [Father] has been diagnosed with major mental illness which includes major depressive disorder.  Major depressive disorder refers to several periods where a person is really unable to function because of such a high level of depression.  And so, diagnostically speaking the depression is so significant that it truncates one to (unintelligible) function and that would – that potentially could effect [sic] parenting, as well.

At the time of my evaluation of [Father] he lived in a two[-]bedroom residence.  He acknowledged three incidents of domestic violence in his nine-year relationship with [Mother], although there's been significant allegations that the incidents were much more intensive and frequent.  He also acknowledged that he lacked stability when the children were first placed.  He acknowledged living with [Mother] in a "drug house" for a time.  He also acknowledged simple assault as a juvenile.  And then he has a variety of criminal activity as an adult including fleeing an officer in 2015, two contempt convictions in 2014, pleading no contest to simple assault in 2015, harassment in 2012, and retail theft in 2016.  These are concerning issues that starting with as [a] juvenile[,] there's evidence of criminal activity for [Father], in conjunction with violating conditions of a PFA and the contempt convictions as well.  So, under supervision there's evidence that he's done poorly as well.

He acknowledged continuous [sic] in returning to the relationship with [Mother], although from his report, he states that she's an addict and that she fabricates allegations against him. There's evidence of alcohol abuse with regard to [Father] from his disclosures to Bedford[,] for example. He's on probation at this point and his IQ score was actually in the borderline area as well, so there is evidence of some intellectual deficits for [Father].

And then in conjunction with these main concerns, I don't have any evidence that [Father] has sufficiently or appropriately addressed his anger management issues and his domestic violence, nor his mental health issues and his alcoholic abuse history. So, there would be concerns from my perspective if the children would be at risk for exposure domestic violence, expos[ure] to anger management issues, exposure to substance abuse and criminal activity, if they were to be returned to their father's care this time.

During the interactional evaluation involving the children and [Father], [Father] had a lot of difficulty controlling [C.J.W.]'s behavior. He lacks parental authority. He used (unintelligible) in an attempt to try to gain compliance from [C.J.W.] He lost his temper frequently, was very easily frustrated. There were a lot of parenting deficits noted with regard to [Father], as well. So, as a result of these factors I don't have evidence that [Father] is in a position to appropriately care for the children's needs and welfare.

N.T., 1/2/18, at 19-22. Consistent with Dr. O'Hara's testimony, Ms. Crissey indicated that termination would favor the Children's needs and welfare. N.T., 5/14/18, at 69.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d at 513. Thus, we conclude that the trial court did not abuse its discretion by involuntarily

terminating Father's parental rights to C.J.W. and D.E.W. pursuant to Section 2511(a)(8). As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next turn to whether termination was proper under Section 2511(b). Father, however, failed to present any argument and/or discussion related to subsection (b) in his brief. As such, Father waived a challenge related to subsection (b). *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 611 Pa. 643, 24 A.3d 364 (2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa.Super. 2017). Nevertheless, had Father preserved a claim as to subsection (b), we would find such a claim lacked merit.

Our Supreme Court has stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's

> "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

However, our Supreme Court has stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *See In re: T.S.M.*, 620 Pa. at 627, 71 A.3d at 267 (quoting *In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa.Super. 2008). The Supreme Court stated, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding.") *See In re: T.S.M.*, 620 Pa. at 629, 71 A.3d at 267 (quoting *In re Involuntary*

**Termination of C.W.S.M.**, 839 A.2d 410, 418 (Pa.Super. 2003) (Tamilia, J. dissenting)).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

**In re Adoption of C.D.R.**, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting **In re N.A.M.**, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in determining that termination of Father's parental rights favors the Children's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated as follows:

Moving to the second part of the analysis, which is the best interest analysis with the kids. It's clear there is an emotional bond, but our [c]ourts have long pointed out – I'll quote one Supreme Court case here, [**In re K.K.R.-S.**, 958 A.2d 529, 535 (Pa.Super. 2008)]. The mere existence of a bond or attachment of a child to a parent will not necessarily result in denial of a termination petition. The -- let me see if I can find this – [**In re C.L.G.**, 956 A.2d 999 (Pa.Super. 2008)] and that is that while the bond is a factor, an important factor to consider, the child's housing needs, safety needs, and other needs must also be considered. I do find that you have obtained stable housing. That your current housing is stable and so is your employment. But these other needs have not been met. There is a bond with the children, but I don't think that's sufficient in this case, viewing the deficiencies of both parties to overcome that the best interest of

- 27 -

these children is [sic] unfortunately supports a change of goal to termination of parental right.

N.T., 5/14/18, at 140-41.

Upon review, we again discern no abuse of discretion. As explained above, our review of the record confirms that terminating Father's parental rights will best serve the needs and welfare of C.J.W. and D.E.W. The record supports the trial court's finding that the children's developmental, physical and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b).

As observed, C.J.W. and D.E.W. have been in care over two years. N.T., 5/14/18, at 61, 73. Throughout this time, Father only had supervised visitation, which was suspended and has remained suspended since October 2017. *Id.* at 61, 73-74; *see also* Exhibit 12, 5/14/18; *see also* Order, 10/10/17.

Notably, while Dr. O'Hara recognized that Father loved the Children and suggested that the Children would experience harm as a result of the termination of parental rights, Dr. O'Hara expressed that any harm to the Children would be outweighed by permanency.[19] N.T., 1/2/18, at 22-24. Dr. O'Hara testified as follows:

Q. Dr. O'Hara, you previous[ly] stated that both parents do love their children. In your opinion, if the parents['] parental rights were [terminated], do you believe that there would be significant

_____

[19] Dr. O'Hara expressed that there should be ongoing contact between the Children and parents if the parents are stable. N.T., 1/2/18, at 33.

detriment to the children as a result of the termination of their parental rights?

A. I think that there would be some detriment for the children. I think the children did show positive, both with [Mother] and with [Father] but the foundational issue from my perspective is the lack of stability that [Father] shows and [Mother] shows at this time. Also, there's good reason suggesting that if a child is in a secure and stable household where a child's needs are being met and there's warmth and a supportive presence towards a child, this mediates [*sic*] against a potential detriment to the child. So, I think in the case of [S.J.W.] and [J.C.W., Jr.], there's good evidence from my perspective that the potential loss of the relationship would be mediated [*sic*] by the great level of care that they receive from [foster mother]. I would say the same about [C.J.W.] as well with regard to his paternal caregivers. And I think there is some evidence that [D.E.W.] has a connection with [foster mother]. I really hope that [foster mother] makes an improvement with regard to how she interacts with [D.E.W.] because I think [D.E.W.] has a lot of needs for affection and that sort of thing, which is a struggle for [foster mother] in my opinion. But overall[,] I think there's a benefit the children would receive in a situation of stability and care would outweigh any potential detriment in the termination of parental rights for [Father] and [Mother].

*Id.*

We further reiterate the opinion of Dr. O'Hara, set forth above, that Father was not in a position to adequately care for the Children's needs and welfare. *Id.* at 19.

Thus, as confirmed by the record, termination of Father's parental rights serves C.J.W. and D.E.W.'s developmental, physical and emotional needs and welfare and was proper pursuant to Section 2511(b). While Father may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*,

- 29 -

994 A.2d at 1121. At the time of the hearing, C.J.W. and D.E.W. had already been in care for twenty-six months, and are entitled permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Lastly, we turn to the question of whether the trial court appropriately changed the permanency goal to adoption. In so doing, our standard of review is the same abuse of discretion standard as noted above. *See In the Interest of L.Z.*, ___ Pa. ___, 111 A.3d 1164, 1174 (2015) (citing *In re R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)), for the proposition that the abuse of discretion standard applies in a dependency matter; *see also In re S.B.*, 943 A.2d 973, 977 (Pa.Super. 2008) ("In cases involving a court's order changing the placement goal from "return home" to adoption, our standard of review is abuse of discretion.")

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6)

the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011) (citations and quotation marks omitted).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> . . .
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

In the case at bar, Father posits that it was not in the Children's best interests for the trial court to change the Children's permanency goal to adoption. Father's Brief at 8-9. Father argues that the evidence suggests that there in fact exists a "beneficial[] and strong" relationship between him and the Children, in particular C.J.W. and D.E.W. *Id.* at 9. Father asserts,

> In the case at hand, it was noted during Dr. O'Hara's testimony that it was evident that [Father] cares deeply for his children. He testified himself that his goal is to get them home.

He would be able to care for them, as he has support from his friends and family. Furthermore, Dr. O'Hara recognized the beneficial nature of the relationship, and recommended that there still be contact between the children and [Father], as long as he is stable. As noted under argument for section C herein, [Father] has demonstrated stability in housing, employment, and his mental health. Furthermore, at least two of the children would like to maintain the relationship. C.J.W. and D.E.W. informed their counsel [Father] calls regularly, and they look forward to the calls. C.J.W. would like to return and live with his father. At this point, D.E.W. only requested visits with her father. These statements from the children indicated the relationship is still beneficial, and strong. The goal of return to parent should not be abandoned, based on the circumstances noted above. Thus, [Father] respectfully requests the lower court's order be overturned on this basis.

*Id.* at 8-9 (citations to record omitted).

However, upon review of the record, Father's claim lacks merit. The record reveals that a change of the permanency goal to adoption was in the C.J.W. and D.E.W.'s best interests. C.J.W. and D.E.W. had been placed for over two years. N.T., 5/14/18, at 61, 73. During such time, Father had not obtained unsupervised visitation and his supervised visitation remained suspended since October 2017. *Id.* at 61, 73-74; *see also* Exhibit 12, 5/14/18; *see also* Order, 10/10/17. Further, Father had not successfully remedied the circumstances and conditions that led to the children's placement. *Id.* at 68-69. Moreover, as indicated, he was found to be unable to adequately provide for the children's needs and welfare. N.T., 1/2/18, at 19. As C.J.W. and D.E.W. are entitled to permanency and stability, the record supports that a goal change was in their best interests. Accordingly, after review of the record, we again discern no abuse of discretion, and conclude

that the trial court properly changed the C.J.W. and D.E.W.'s permanency goal to adoption.

Based on the foregoing, we vacate the goal change orders and orders terminating the parental rights of Father as to J.C.W., Jr., and S.J.W. and remand for the appointment of separate legal-interests counsel. In addition, because we conclude that the orphans' court did not abuse its discretion by changing the permanency goal and terminating the parental rights of Father as to C.J.W. and D.E.W., we affirm those orders.

Orders affirmed as to C.J.W. and D.E.W.; orders vacated as to J.C.W., Jr., and S.J.W., and remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judge Murray joins the Memorandum.

Judge Ott files a Concurring Statement

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/12/2018

- 33 -